## ALBERT HALL v. THE STATE.

*No. 299.   Decided April 21.*

**1. Murder—Charge—Express Malice.**—On a trial for murder, where, in relation to the indicia of express malice, the court instructed the jury that "the mind need not be absolutely calm, unruffled, or self-possessed," *Held*, correct when taken in connection with the context and in conformity with previous decisions in this State. Farrer v. The State, 42 Texas, 271; Duebbe v. The State, 1 Texas Crim. App., 159.

**2. Same—New Trial—Newly Discovered Evidence.**—Where newly discovered evidence is a ground relied on in a motion for new trial, and the same is not supported by either the affidavit of the proposed absent witness, the defendant, or his counsel, it will not be considered.

3.  **Murder of the First Degree.**—See facts stated which, in the opinion of the court, amply support a verdict and judgment for murder of the first degree, with the death penalty.

APPEAL from the District Court of Fayette.   Tried below before Hon. H. TEICHMULLER.

This is an appeal from a conviction for murder in the first degree, the punishment being assessed at death.

The indictment charged that on the 27th of October, 1893, appellant killed one Grant Banks, in Fayette County.   The following is a statement of the facts as shown by the record:

Dr. G. W. Sutherland testified:  "I am a practicing physician; live at Winchester.   I was called to see Grant Banks on October 27, 1893. I went to the farm of Mr. Zills, about three miles from Winchester, where I found the dead body of Grant Banks in a cotton patch.   He had been dead probably an hour.   I examined the body and found three gunshot wounds; one flesh wound near the right knee; one bullet had entered the left side, coming out on the opposite side, and one entering the back, shattering the backbone and lodging just under the skin in front.   He died from the gunshot wound.   His neck was broken and the base of the skull crushed in.   This was occasioned by licks on the back of the neck and head with some iron or other heavy instrument."

Mary Ann Gilmore testified:  "I knew Grant Banks, and am acquainted with defendant, Albert Hall.   They were at my house the night before Grant was killed.   Jim J., Robert, and John Hart, defendant, and deceased were on the floor playing craps for pecans, when John Hart and defendant got into a quarrel about the game and began fighting.  .I grabbed John Hart, and asked deceased to assist me in separating them.   He grabbed defendant and was pulling him back while I was trying to keep John away from defendant.   John had a smoothing iron and attempted to strike defendant with it, but missed and struck me on the left arm."

John White testified:  "I know the defendant.   The night before Grant Banks was killed, defendant came to my house and tried to borrow a pistol from me.   He said he had trouble with deceased.   I live half a mile from Mary Ann Gilmore, and about the same distance from Marshall Hall, where defendant was staying.   To go from Mary Ann Gilmore's to Marshall Hall's the defendant would not have to come by my house; it is a short distance out of the way.   I don't know what time it was.   I was in bed and had been asleep.   I think it was late."

Cross-examined:  "When defendant asked me for the pistol he said deceased had threatened to kill him, and had told him to come to the field next morning prepared.   I knew defendant by his voice."

Marshall Hall testified: "I am defendant's cousin. He was living with me when Grant Banks was killed. The night before Banks was killed defendant came home about half-past 12 o'clock. Next morning he asked if he might ride one of my horses to the field where we were picking cotton. I told him to take both of them and stake them out in the farm. We were picking cotton on the Zills farm. While I was eating breakfast my wife called attention to defendant riding away on my gray mare. This was shortly after sunrise. The next I saw of defendant was about 10 o'clock, near the place where I was at work. The shooting attracted my attention. I saw John and Jim Hart, Jr., and deceased running away from the wagon and into the cotton, and defendant was shooting at deceased."

Cross-examined: "When defendant came home that night he said he had had trouble with deceased and John Hart; that deceased had held him while John Hart 'beat him up' with a smoothing iron. He showed me a cut on his lower lip. He seemed very much excited. He told me also that deceased had made threats against him, and had told him to come to the field prepared. Deceased was a dangerous man, and was overbearing among the negroes since he killed another negro in Bastrop County last year."

Cass Hall testified: "I am the defendant's uncle. I live two and one-half miles from the Zills farm. The day Banks was killed defendant came to my house and asked me for my Winchester; said he wanted to kill a crow. I refused to let him have the gun. He was riding a gray mare belonging to Marshall Hall. I then went into the lot, and shortly afterwards saw defendant galloping away with my gun. I hallooed at him to bring it back, but he kept going. In about an hour he returned running and gave me the gun. The magazine of the gun was bent and there was blood on it. The magazine had four cartridges in it when defendant got it and none when he returned it."

Jim Hart, Jr., testified: "Know defendant. On the 27th of October, 1893, I was gathering and hauling corn. Grant Banks and John Hart were with me. We met defendant in the road leading from the field to the house of Jim Hart, Sr. We were going home with a load of corn. It was about 10 o'clock. Defendant was on horseback, and carrying a gun. Deceased said, 'Hello,' and defendant replied, 'Hello, Banks. how's you fixed?' Defendant gave us the road. When he had passed us he jumped down from his horse and began shooting. We jumped from the wagon. I ran back of the wagon, stopped a moment, and then ran up the road a short distance, when I stopped. John Hart ran into the field and went south, the same direction we were travelling. Deceased ran east into the cotton patch. Defendant fired four shots. The first shot was fired before we got off the wagon. The second shot was fired at deceased about the time he was going under the wire fence into the field. Defendant then advanced towards

deceased and fired again.   Deceased fell, and defendant went into the field and to the point where deceased had fallen, and pointing his gun downward towards deceased fired again.   When he stopped I heard deceased say, 'Don't shoot me any more; you have already killed me.' I heard nothing more from deceased.   Then defendant took his Winchester and struck deceased twice across the back of the head or neck. All this occurred in Fayette County, Texas."

Robert Hart testified:   "I was at Mary Ann Gilmore's the night before Grant Banks was killed.   I left the house to go home (to Jim Hart's, Sr.) in company with Grant Banks (who was stopping there), Jim Hart, Jr., and defendant.   I stopped on the way at the well to get a drink of water.   Just before we got to Jim Hart's, Sr., defendant turned off the road, and I heard him say to deceased, 'You God damn black son-of-a-bitch, I will kill you to-morrow.'   They had been quarrelling along the road."

Cross-examined:   "During the trouble in the house I saw deceased pick up a gun and point it at defendant.   Mary Ann Gilmore said, 'Put that gun down; it ain't loaded.'"

Jim Hart, Sr., testified:   "I live near Mary Ann Gilmore's.   Grant Banks was working for and living with me at the time of his death.   I was not related to him.   I heard of deceased being charged with having killed a man in Bastrop County last year.   He was never convicted for it; he had a trial and was acquitted.   I was at home the night before the killing.   About 10:30 o'clock I heard defendant and deceased coming towards my house, quarrelling.   I got up and went to the door.   Defendant turned off towards Marshall Hall's, and hallooed to deceased, 'You God damn son-of-a-bitch, I will kill you to-morrow.'"

Cross-examined:   "I do not know exactly what time it was.   I knew the parties by their voices."

Peggy White testified:   "I was picking cotton the day of the killing, in the field about 200 yards from the killing.   The shooting was the first thing to attract my attention.   I then ran in the direction John Hart was going, and then returned towards the wagon.   I met Albert Hall, and he said, 'I got one of the damn sons-of-bitches.'"

John Hart testified:   "The night before deceased was killed I was at Mary Ann Gilmore's playing craps for pecans with defendant, deceased, Jim, and Robert Hart.   Defendant and I got into a fuss about the game and had a fight.   Mary Ann Gilmore and Grant Banks separated us.   While they were holding us I struck at defendant with a smoothing iron. .  They say I hit my mother, but I don't know whether I hit her or defendant.   After the trouble the parties left the house and went home.   The next morning deceased, Jim Hart, Jr., and I went to the field and gathered a load of corn.   As we were returning home about 10 o'clock we met defendant.   He turned out of the road, and said, 'Hello, Banks.'   Deceased replied, 'How are you?' and defend-

ant said, 'All right; how's you fixed?' and jumped from his horse, as he was behind the wagon, and began shooting at us. We jumped off the wagon, and as I was in the act of jumping the first shot was fired. It struck me and made a flesh wound in my side. I ran towards home. Did not see any more shooting, but heard three shots."

Cass Hall testified: "When Albert Hall returned my gun he was very much excited. He said, 'I have killed Grant Banks, because I was afraid of him. He threatened my life last night, and told me to come to the field prepared.'"

—— Hall testified: "I am the father of defendant; he is about 19 years old. This is the first time he has ever had trouble. Don't know what year defendant was born."

Albert Hall, in his own behalf, said: "The night before the killing I was shooting craps at Mary Ann Gilmore's. John Hart and I had trouble about the game, and fought. Deceased held me while John Hart struck me with a smoothing iron. After that was done, I asked him 'why he had done that?' and he said, 'Don't you like it?' and picked up a gun and pointed it at me. Mary Ann Gilmore said, 'Put that gun down; it ain't loaded.' When I left the house and started home deceased threatened my life. I went to John White's and tried to borrow a pistol. I told him I wanted the pistol because Grant had threatened my life, and told me to come to the field prepared. I then went home and told Marshall Hall what had occurred. The next morning I went to Cass Hall to borrow his gun, because of deceased's having threatened me, and then went on towards the field to my work. I met the wagon on my way and turned out of the road. Deceased said, 'Hello, Albert,' and I said, 'Hello.' He then said, 'How's you fixed?' I said, 'Very well; how's *you* fixed?' He replied, 'I'm fixed God damn well,' and made a motion as if to pick a gun up from the wagon. I jumped down off my horse and began shooting at deceased. If I hit him with the gun I don't know it, because I was so scared. After the shooting I gave the gun back to Cass Hall and went to town and gave up."

Cross-examined: "I shot three times; the first time when deceased made a motion as if to draw a gun, the next time when he was in the cotton circling around with his left side towards me, and the last time when he was on the ground. I do not remember striking him with the gun. The corn in the wagon was not up to the top by about a foot. When I went up to deceased in the field he was leaning on his left elbow, with his face towards me, and I shot him. He did not have his back towards me, and was not lying on his face. When I went to borrow the gun from Cass Hall I told him I wanted it to kill a crow; and it was my intention to kill a crow to use for fish bait. I did not see deceased have a gun or weapon of any sort."

John Hart, in rebuttal, said: "Deceased had no gun or pistol nor weapon of any kind in the wagon. The wagon bed was level full with corn."

Cross-examined: "We had travelled about 300 yards with the corn when we met defendant, and he was on the road which led to his work."

Several witnesses testified to the good character of defendant as a peaceable and law-abiding citizen, and that they had never before heard of his having a difficulty with any one.

*W. H. Ledbetter*, for appellant.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant's punishment was assessed at death, under a conviction of murder in the first degree. He failed to reserve exceptions to any rulings of the court had upon the trial.

1. In his motion for new trial it is contended by appellant the court erred in instructing the jury, that "the mind need not be absolutely calm, unruffled, or self-possessed." This is an excerpt from a sentence included in the court's definition of malice. Taken in connection with the remainder of the charge, it is in strict conformity with the law as it has previously been understood and announced in this State. Farrer v. The State, 42 Texas, 271; Duebbe v. The State, 1 Texas Crim. App., 159. The proposition announced by the court is correct. The definitions of malice aforethought, as well as of express and implied malice, are in strict conformity with law and unobjectionable.

2. The allegation of newly discovered testimony, contained in the motion for a new trial, is totally unsupported by the affidavit of the defendant, his counsel, or the witness by whom the facts were expected to be shown. In fact, if the evidence is true it tended to strengthen the theory of express malice, and its probative force was to show malice and motive for the killing.

The evidence clearly proves a murder upon express malice.

No error being disclosed, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.